Appeal of Ethel BOLDEN, et al.

Mary DYER

v.

**BLUE CROSS & BLUE SHIELD ASSOCIATION, INC., et al.**

No. 87–5012.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1987.
Decided May 17, 1988.

Michael D. Hausfeld, with whom, John Ellsworth Stein and Jennifer Crowe, Washington, D.C., were on the brief for appellants.

Robert C. Chestnut, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and John Cordes, Atty., Dept. of Justice, were on the brief for appellees Constance Horner, Office of Personnel Management and U.S.

Philip S. Neal, with whom, Terry Bancroft Dowd and Kevin C. Dwyer, Washington, D.C., were on the brief for appellee Blue Cross and Blue Shield Ass'n.

Before BUCKLEY and WILLIAMS, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

Two classes of *former* enrollees in the Blue Cross and Blue Shield Association ("Blue Cross") Government–Wide Service Benefit Plan, who withdrew from the Plan or changed plans prior to May 1, 1985, bring this action to compel their inclusion in a $784 million refund by Blue Cross of excess contingency reserve funds, which refund is presently limited to enrollees who were subscribers in a Blue Cross plan as of May 1, 1985. Plaintiffs contend that the decision of the Office of Personnel Management ("OPM") to approve the refund proposal was "arbitrary, capricious and an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court upheld the decision by OPM, concluding that limiting the refund to those enrolled in Blue Cross as of May 1, 1985 was rational and supported by the record. *Bolden v. Blue Cross and Blue Shield Association*, 669 F.Supp. 1096, 1106 (D.D.C.1986). We affirm.

## I. BACKGROUND

### A. *Statutory Framework*

In 1959, Congress created a subsidized health insurance program as a benefit for civilian employees and annuitants of the federal government. Federal Employees Health Benefits Act of 1959, 5 U.S.C. §§ 8901 *et seq.* ("the Act"). With almost 300 plans participating the program is competitive. During a four week "open sea-

son" each year, federal employees and annuitants can compare and change plans. 5 U.S.C. § 8905(e); 5 C.F.R. § 890.301(d).

Under the Act, the Office of Personnel Management is given broad authority to administer the Federal Employees Health Benefits Program ("the Program"). OPM contracts with insurance carriers to provide health insurance benefits and each year renegotiates the coverage and rates based upon prior experience and insurance industry practice. 5 U.S.C. § 8902(i). OPM attempts to set the rates of the various plans so they will be sufficient to cover future claims and overhead costs and maintain surplus funds for unexpected costs. 5 U.S.C. §§ 8902(i), 8909(b).

"Reserves" are required to be established to meet anticipated claims. 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503. Many uncertain factors affect program costs, such as the number of enrollees who will move in and out of a plan and the amount and cost of health care services that enrollees will require. GAO Report, App. 705; S.Rep. No. 468, 86th Cong., 1st Sess. 18 (1959). These uncertainties make it improbable that any premium rates negotiated by OPM will exactly equal future costs. The reserves can be drawn upon when health care claims exceed annual program income. Program reserves are held partly by the government in "contingency reserves" which are earmarked for each carrier, and partly by the participating carriers in a "special reserve."

After the premium rates are set for the next contract year, OPM determines the amount of the government's contributions. 5 U.S.C. § 8906. The part of the premium not paid by the government is withheld from the pay of each enrolled employee and from the annuity of each enrolled annuitant. 5 U.S.C. § 8906(d). The set premium may not be changed during the contract year. Employees and annuitants receive the contract benefits during the year at the contracted rate whether costs and claims are unexpectedly high, requiring a charge against reserves, or low, resulting in a surplus. 5 U.S.C. § 8902(i).

Government and enrollee contributions to the Employees Health Benefits Fund, which is controlled by OPM, 5 U.S.C. § 8909(a), may be used for three purposes. First, a percentage, not to exceed one percent of all contributions, determined by OPM, is used to pay OPM's administrative expenses. 5 U.S.C. § 8909(b)(1).

Second, a percentage, not to exceed three percent of all contributions, determined by OPM, may be used to establish a contingency reserve for each plan. 5 U.S.C. § 8909(b)(2). Contingency reserve funds may be used to compensate for underestimates of claims costs and may be transferred to a plan's special reserve if underestimated claims create a deficit in the special reserve. 5 C.F.R. § 890.503(c). Similarly, excess special reserves may be transferred to a plan's contingency reserve. 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503(c)(1)(v). Contingency reserves may be used, at OPM's discretion, for three purposes: (1) to defray increases in future rates; (2) to reduce the contributions of the government and enrollees; or (3) to increase the benefits provided by a plan. 5 U.S.C. § 8909(b).

Third, the remaining contributions by enrollees to each plan are paid into that plan's special reserves, which are used to pay enrollees' health insurance claims. Surplus or deficit special reserves are carried over each year and become a factor in determining the appropriate rate for the following year. 41 C.F.R. § 16–4.152–1(b)(2). OPM may lower enrollees' premium rates to draw down a plan's surplus special, or it may increase rates to recover from a deficit reserve balance. In both cases it is the subscribers who are enrolled for the current contract year that benefit or suffer.

### B. *Factual Background*

Unanticipated large cost increases in the medical field and high use of health care services by enrollees created financial problems for health plans in the early 1980's. Blue Cross had a $150 million deficit in its Federal Employee Health Benefit Plan (the "Plan") special reserve by the end of 1981. In response to the deficits, OPM introduced major cost containment, benefit reduction

and cost-sharing initiatives to encourage more responsible use of health care services by Program enrollees, doctors and hospitals. OPM also negotiated premiums to cover higher expected costs and to build up reserves. Nationwide reductions in medical care use and costs resulted in substantial surpluses in the Plans' special reserve accounts. In May, 1985, Blue Cross estimated that its special reserve balance would be approximately $957 million by the end of 1985, of which $754 million was surplus not necessary to cover estimated future costs.

On May 20, 1985, while OPM was evaluating various ways to decrease excess reserves, Blue Cross announced a proposal for reducing its reserves. It proposed to send all persons enrolled as of May 1, 1985 a one time payment, a "refund," which would effectively reduce their contributions toward 1985 premiums. Blue Cross also proposed to give the government a refund proportionate to the amount the government contributed toward the premiums.

OPM immediately began studying the Blue Cross proposal. On May 30, 1985, OPM conducted a public hearing to solicit comments on the Program's reserve levels, the management of the reserves and the Blue Cross proposal. Five OPM officials conducted the meeting at which fourteen witnesses expressed many divergent views. At least one OPM official and two witnesses questioned whether former enrollees should receive refunds. App. 157, 192–93, 251. OPM also asked the Office of Legal Counsel ("OLC") in the Department of Justice for its opinion as to the legality of a refund to enrollees as of May 1, 1985. App. 451–52. In a July 10, 1985 opinion, OLC concluded that the refund was legal, App. 453, reasoning that under section 8909(b), excess special reserves could be transferred to contingency reserves, and paid out as "reductions in contributions." App. 470. OLC noted, however, that while refunds could be made to employees, the word "employees" in 5 U.S.C. § 8909(b) would have to be changed to "enrollees" before such refunds could legally be made to subscribing annuitants. App. 471. OLC did not discuss whether refunds could be

paid to former enrollees. On July 16, 1985, OPM announced that President Reagan accepted "the essential elements" of the Blue Cross proposal. App. 473. OPM instructed the insurance carriers to decrease their special and contingency reserves to an amount equal to two months of premium income by the end of 1986. App. 505–507. All Plans had the option of reducing their reserves either by reducing 1986 contributions using refunds, or by reducing 1986 premium rates, or by a combination of both methods. App. 63, 505–507. Many Plans chose the refund option. App. 705.

OPM followed OLC's recommendation and sought legislation that would allow subscribing annuitants to share in the proposed refunds. App. 474–77. In a letter to Speaker of the House Thomas P. O'Neill, Jr., OPM set forth the proposed language for the legislation and stated that OPM planned to use surplus reserves to reduce "current contributions" of those "enrolled" in a plan. App. 474. Congress adopted OPM's proposed language in passing H.R. 3384 in December, 1985. H.R. 3384, § 101, 99th Cong., 1st Sess. (1985). President Reagan vetoed the bill due to unrelated provisions, however, the necessary legislation was subsequently passed by Congress and approved by the President on February 27, 1986. Federal Employees Benefits Improvement Act of 1986, Pub.L. No. 99–251, § 101, H.R. 4061 (1986), 100 Stat. 14. Eleven plans eventually sent refunds to persons who had been enrolled in their plans as of certain dates in 1985. App. 571, 736–62. Aside from $25 million set aside pending the outcome of this lawsuit, the Blue Cross refund is complete.

On August 20, 1985, plaintiffs brought this action seeking their inclusion in the refund. Plaintiffs claimed that the decision by OPM to adopt the eligibility date of May 1, 1985 as proposed by Blue Cross was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The first class of plaintiffs are federal employees who were enrolled in a Blue Cross plan in 1983 and 1984, but left the plan prior to May 1, 1985, thereby placing themselves in a posi-

tion where they were ineligible for the Blue Cross refund. The second class of plaintiffs are federal employees who were in a Blue Cross high option or family plan during 1983 and 1984, but withdrew therefrom and were enrolled in a Blue Cross low option or single enrollment plan as of May 1, 1985. The second class of plaintiffs received a refund as low option or single enrollees, but seek a larger refund based on their enrollment in a high option or family plan during 1983 and 1984. To permit the refunds to go forward while this case was pending, the parties entered into a stipulation on February 7, 1986 pursuant to which $25 million of the refund amount was set aside in an escrow account, that would be sufficient to protect the two classes if plaintiffs were successful. The defendants agreed to the certification of the two classes and the plaintiffs agreed not to attempt to enjoin the distribution of the remaining $759 million.

The district court granted defendants' motion for summary judgment, holding that OPM's decision "is supported by the record, and is not arbitrary, capricious or an abuse of discretion." *Bolden v. Blue Cross and Blue Shield Association*, 669 F.Supp. 1086, 1107 (D.D.C.1986). The plaintiffs contended that the court's standard of review should not be deferential to OPM because OPM did not rely on its own judgment and that OPM relied on a misreading of a statute. The court disagreed, concluding that it should presume the agency's action is valid and uphold the agency's decision if a rational basis existed for its decision. *Id.* at 1101. The court emphasized that judicial review of an agency's interpretation is particularly narrow where the challenged action involves the agency's construction of the statute it is empowered to administer. *Id.* The plaintiffs contended that the court should not consider OPM's March 31, 1986 Decisional Memorandum in evaluating the agency's action. Plaintiffs characterized the Memorandum as "mere *post hoc* rationalizations," but the court admitted it to "illuminate[ ] reasons obscured but implicit in the administrative record." *Id.* at 1102. Additionally, the court found that Congress had

implicitly approved OPM's interpretation of the statute when it amended 5 U.S.C. § 8909(b), *id.* at 1103, and rejected plaintiffs' argument that they had any equitable interest in the refund money. *Id.* at 1104. Finally, the court found that OPM's decision to deny a share of the refund to former enrollees was consistent with insurance industry practice. *Id.* at 1105.

## II. ANALYSIS

We conclude that OPM's decision was not arbitrary or capricious. OPM acted in conformance with congressional intent and insurance industry practice. Plaintiffs have no equitable interest in any portion of the Blue Cross refund money. We therefore affirm the decision of the district court upholding OPM's approval of the May 1, 1985 eligibility date.

### A. *Standard of Review*

 The district court correctly applied a narrow standard of review to OPM's action. Id. at 1101. A court should presume an agency's action to be valid under the highly deferential "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A) (1976 and Supp. III 1979). *Environmental Defense Fund, Inc. v. Castle*, 657 F.2d 275, 283 (D.C.Cir.1981). A court cannot substitute its judgment for that of an agency, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and must affirm if a rational basis for the agency's decision exists. *Environmental Defense Fund v. Castle*, 657 F.2d at 283. OPM's decision to accept the May 1, 1985 eligibility date should be upheld if it falls within the permissible range of interpretations. *Office of Consumers' Counsel, Ohio v. F.E.R.C.*, 783 F.2d 206, 218 (D.C.Cir.1986). As stated previously, judicial review is particularly limited in cases in which plaintiffs challenge an agency's construction of the statute it is empowered to administer. *Chemical Manufacturers Association v. N.R. D.C.*, 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985).

Plaintiffs contend that OPM's decision is not entitled to deference because OPM did not rely on its own judgment, but rather on the OLC opinion, in deciding to accept the May 1, 1985 eligibility date. Brief of Plaintiffs at 19, 30. Plaintiffs also claim that OPM misinterpreted OLC's construction of § 8909(b) to mean that only refunds to current or future employees were allowed. *Id.* This court has held that deference "is appropriate only when an agency has exercised its *own* judgment. When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand." *Phillips Petroleum Co. v. F.E.R.C.*, 792 F.2d 1165, 1169 (D.C.Cir.1986). *See also Prill v. N.L.R.B.*, 755 F.2d 941 (D.C.Cir.1985).

There is no support for plaintiffs' contention that OPM did not rely on its own judgment. Plaintiffs only rely on OPM's Memorandum of Points and Authorities in support of its motion for summary judgment. Brief of Plaintiffs at 30. While OPM's Memorandum does argue that "provisions in section 8909(b) reinforce OPM's conclusion that a plan's contingency reserves can *only* be used to benefit a current or future enrollee of that plan," Memorandum at 21, plaintiffs never explain how that statement proves that OPM reached its conclusion based solely on an erroneous view of the OLC opinion. For three reasons, it is more consistent with OPM's decision making process to assume that OPM took OLC's opinion into account and then made its own decision. First, on the "Blue Cross and Blue Shield Refund Proposal," App. 452, which Blue Cross originated (App. 63), OPM solicited comments from a number of sources both within the government, such as the Office of Management and Budget, App. 452, and from the public, not just from OLC. Second OPM did not seek OLC's advice on whether *former* enrollees could participate in the refund, which is the specific point at issue in this case. OPM only requested the opinion of OLC on whether a refund limited to "enrolled" subscribers was valid under existing statutes and regulations. App. 452. Third, OPM based its decision on many factors, such as the forward looking nature of the *statutory* scheme, the need for unencumbered reserves and general insurance principles, which the OLC opinion of July 9, 1985 did not discuss. App. 452. It is also significant that it was Blue Cross that first tentatively decided to make the refund to those who were enrolled on May 1, 1985 and then OPM requested comments from interested and knowledgeable sources. To find the Blue Cross proposed plan to be valid under these circumstances does not indicate such subservience to others as to constitute a surrender of its own original basic judgment. Parties are not to be determined to have surrendered their judgment when they seek a legal opinion as to the validity of a proposed plan.

Plaintiffs also contend that OPM's decision is not entitled to deference because OPM relied on a misinterpretation of the relevant statute. Brief of Plaintiffs at 30–32. This contention is based on the assertion that because of OPM's alleged misreading of the OLC opinion, OPM erroneously concluded that *only* current enrollees, not persons in plaintiffs' positions, could be eligible for the refund.[1] Memorandum of Points and Authorities at 19–20. The district court's interpretation of the statute is discussed *infra* at 11–13. We conclude that OPM's decision was rational, reasonable and in conformance with the statute.

---

**1.** OPM Memorandum of Points and Authorities at 19–20 (OPM asserts that giving refunds to plaintiffs "is flatly contrary to 5 U.S.C. § 8909(b), which ... permits such reserves to be used only for the benefit of current or future enrollees."); OPM Memorandum of Points and Authorities at 21 ("provisions in section 8909(b) reinforce OPM's conclusion that a plan's contingency reserves can *only* be used to benefit a current or future enrollee of that plan."); Plaintiffs assert that Blue Cross, in addition to OPM, adopted the erroneous view that "the law does not permit us to refund this money to any person who is not currently enrolled or refund an amount based on a previous enrollment code." Brief of Plaintiffs at 19; App. 919 (July 23, 1985 letter from James N. Gillman, Blue Cross Vice President, to Robert A. Crummel at the United States Department of Education).

## B. *OPM's Decisional Memorandum*

■ The district court correctly considered OPM's March 31, 1986 Decisional Memorandum. The court found that the Memorandum "merely illuminates reasons obscured but implicit in the administrative record.... What the pre-decisional record suggests, the post-decisional Memorandum merely confirms." *Bolden*, slip op. at 13. The Memorandum provides five reasons for excluding those enrolled in prior contract years from the refund: (1) consistency with the forward-looking nature of the Act, (2) consistency with the language and purpose of the statute, (3) avoidance of any suggestion of an equitable interest in the reserves, (4) administrative convenience, and (5) consistency with general insurance practice.

■ Plaintiffs contend that the Memorandum should not be considered because it constitutes *post hoc* rationalization. An agency may not assert *post hoc* reasoning as the basis for its decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *accord Citizens to Protect Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). This court has recently held that the record to be considered by the reviewing court "consists of the administrative record compiled by the agency in advance of litigation, not any record thereafter constructed in the reviewing court." *AT & T Information Systems, Inc. v. General Services Administration*, 810 F.2d 1233, 1236 (D.C.Cir.1987). The *AT & T* court emphasized that its holding applied to informal agency proceedings, "bar[ring] introduction of litigation affidavits to supplement the administrative record." *Id.*

*AT & T* is distinguishable from this case. In *AT & T* the court stressed that the declaration sought to be introduced contained only new explanations and that the agency had provided *no* rationalizations for its actions at the agency level. *AT & T*, 810 F.2d at 1236. The *AT & T* court recognized the "exception allowing agencies to supplement the record to provide 'such additional explanations of the reasons for the agency decision as may prove necessary.' " *Id. quoting Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The district court concluded here that OPM had previously considered the reasons given in its decisional Memorandum, and therefore the Memorandum should be admitted to amplify the administrative record. *Bolden*, 1102 (citing the Administrative Record at 99, 131, 402, 405).

Plaintiffs filed their suit in August of 1985. Although it is unclear exactly when OPM made its final decision to approve the Blue Cross proposal,[2] the annuitant legislation was not passed until February 27, 1986 (100 Stat. 14),[3] and OPM's approval was apparently contingent upon the amendment to section 8909(b). App. 636. (September 6, 1985 OPM letter to Blue Cross stating: "[i]f legislation authorizing the payments to annuitants is not enacted, this entire proposal to reduce the contributions of subscribers and the government will terminate."); *see also* App. 471, 474; *National Treasury Employees Union v. FLRA*, 712 F.2d 669, 670–71 (D.C.Cir.1983) (agency decision is not final or effective "while it remains tentative, provisional, or contingent, subject to recall, revision or reconsideration by the issuing agency."). Since plaintiffs filed this action before OPM had made a final decision, OPM was required to submit its decisional Memorandum after the suit had commenced.

■ Plaintiffs next contend that OPM's decision to extend refunds to all who were

---

**2.** The district court did not decide when OPM made a final decision to approve the proposal. *Bolden*, 1101, n. 3. The court concluded that "[e]ven assuming that OPM had taken final agency action by July 16, 1986, as plaintiffs contend, we find the Memorandum is a legitimate basis for review." *Id.*

**3.** 5 U.S.C. § 8909(b), in part, was amended to read as follows:

The contingency reserves may be used to defray increases in future rates, or may be applied to reduce the contributions of *enrollees* and the Government to, or to increase the benefits provided by, the plan from which the reserves are derived, as the Office from time to time shall determine.

(Emphasis added). The sole change was to substitute "enrollees" for "employees."

enrolled in a Blue Cross Plan as of May 1, 1985 is inconsistent with its interpretation of § 8909(b) as limiting refunds to *current* enrollees. Not so; OPM's reference to *current* enrollees was meant to contrast principally with prior subscribers who were enrolled during the periods when the surpluses accrued. The date set for determining eligibility properly *preceded* the date the refund was announced so as to avoid influencing choices of newly-hired employees by an inducement that was not likely to be repeated. App. 63.

OPM was acutely aware that announcing a proposal to refund excess funds to subscribers enrolled as of a predetermined future date would cause a sudden and counterproductive flood of enrollments. It thus applied the statute so as to define enrollees as subscribers enrolled on a specific recent date under the enrollment code for the contract year at the time the refund plan was announced. In addition to avoiding the creation of unusual enrollment incentives, the plan was consistent with OPM's view that refunds should not be directly related to the period in which the surplus developed, in order to avoid suggesting the existence of a kind of equitable entitlement when in fact the reserves were completely unencumbered. App. 64. As these policy decisions conform to the intent of Congress as expressed in the statute, we find OPM's approval of the plan to be reasonable.

C. *The Statute*

■ Section 8909(b) provides that "contingency reserves may be used to defray increases in future rates, ... to reduce the contributions of enrollees and the Government ... or to increase the benefits provided by the plan...." 5 U.S.C. § 8909(b). Plaintiffs claim that the phrase "contributions of enrollees" could include past as well as present contributions. The district court first looked to the common usage of the statutory terms, *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108–09, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), and stated that "enrollee" means "a person who is enrolled," thereby implying that "contributions of enrollees" refers to contributions

by presently enrolled subscribers. *Bolden,* 1103. The court then asserted that the implication that 8909(b) only referred to present contributions was not sufficient to be a Congressional mandate, and that it "would not be a distortion of the language of 8909(b) to read 'contributions of enrollees' as also including ... past contributions." *Id.* at 1103. The court concluded that the statute on its face provides some support for both plaintiffs' and defendants' positions, but ultimately held, as do we, that "OPM's emphasis on 'current' contributions is more consistent with the forward-looking tone of the statutory scheme." *Id.* at 1103. This interpretative choice is supported by the maxim *noscitur a sociis,* a word is known by the company it keeps. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); *Neal v. Clark,* (5 Otto) 95 U.S. 704, 708–09, 24 L.Ed. 586 (1877). *Simmons v. United States,* 308 F.2d 938 (5th Cir.1962). *Cf. Wong Kam Wo v. Dulles,* 236 F.2d 622 (9th Cir.1956). The two other uses authorized by section 8909(b) refer to "future rates," and "benefits" which could only come in the future. The court agreed with the defendant, Blue Cross, that "[e]ach one of the proper uses for contingency reserves are future-oriented," and therefore "the legislative context ... supports use of the May 1, 1985 eligibility date." *Id.* at 1103. It would be contrary to the statutory theme expressed in that section to construe the remaining single authorized use to relate back and to create a new benefit out of surplus contributions for those enrolled in prior contract years when they incurred no liability to make up a deficit. It is clear that past enrollees have no obligation to make up a deficit had one occurred, nor any *right,* statutory or equitable, to participate in the refund.

The district court correctly concluded that the approval of the Plan under OPM's interpretation of section 8909(b) should be affirmed. OPM's analysis is more consistent with and is fully supported by the language of the statute. Additionally, as found by the district court, *Bolden,* at 1103, Congress implicitly approved OPM's

interpretation of the statute. It is well established that "once an agency's statutory construction has been 'fully brought to the attention of the public and Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979), quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 487–89, 60 S.Ct. 982, 988–89, 84 L.Ed. 1311 (1940); *accord North Haven Board of Education v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982). When Congress amended the Act to enable annuitants to receive refunds, it was well aware of OPM's position that the Blue Cross surplus would be used to reduce *only* the contributions of May 1 enrollees. OPM had made this eligibility requirement clear in letters to the Speaker of the House, the President of the Senate and the Chairman of the Committee on the Post Office and Civil Service. App. 474 ("any refunds of excess plan reserves should be used to reduce current contributions"), App. 501 ("It is similar to a dividend (payable only to those individuals who are stockholders as of a certain date")). The legislative history of the annuitant legislation also reflects Congress' awareness of the eligibility requirement. The relevant subcommittee report recognized that the refund would only benefit those enrolled "as of a specific date." H.Rep. No. 262, 99th Cong., 1st Sess. 3 (1985).[4] Senator Stevens, the floor manager, recognized that under the proposed distribution plan only "currently enrolled subscribers" as of May 1, 1985 would share in the refund. 132 Cong.Rec.S. 1725 (daily ed. February 27, 1986).

D. *Consistency With Insurance Industry Practice*

■ Although the Act expressly preempts state and local law, 5 U.S.C.

§ 8902(m)(1), insurance industry practice, which is primarily regulated by the states, is a useful and instructive analogy in this case. Insurance practice provides strong support for OPM's decision to approve the May 1, 1985 eligibility date. The "ordinary rule" in this and other circuits is that "an insured may not have any part of his premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned, unless there is an agreement to that effect." *North New York Savings Bank v. F.S.L.I.C.,* 515 F.2d 1355, 1359 (D.C.Cir.1975) (quoting *Fleetwood Acres, Inc. v. F.H.A.,* 171 F.2d 440, 442 (2d Cir.1948)); *accord Euclid National Bank v. Federal Home Loan Bank Board,* 286 F.Supp. 125 (N.D.Ohio 1966). The insurer is entitled to the premium and any profit as "just compensation for the danger or perils assumed." *North New York,* 515 F.2d at 1359, quoting *Couch on Insurance* 2d § 34:9. Since the risk attached when enrollees signed up with Blue Cross plans, it is consistent with the established insurance principle that enrollees were not later entitled to have any portion of their premium contributions returned.

Plaintiffs argue that these insurance principles would lead to the exclusion of current enrollees as well as former enrollees. Brief of Plaintiffs at 38; Reply Brief at 7. Plaintiffs assert that there is an "inherent inconsistency" in the position that "insurance law principles foreclose the relief sought by petitioners [plaintiffs], but not to 'current subscribers.'" Reply Brief at 7. Plaintiffs fail to realize that neither former nor current enrollees had a right to any refund. The focus of this action is whether OPM's decision to include only enrollees who were subscribers on May 1, 1985 was based on rational considerations. As the district court found, OPM's decision that those subscribers enrolled in the cur-

---

**4.** Although this report accompanied the original bill which was vetoed by the President, not the bill that was subsequently passed, no committee report from either House was issued for the second bill. Since the "operative language" of the earlier bill was "substantially carried for-

ward" into the subsequent statute, the legislative history of the initial bill is "wholly relevant to an understanding" of the statute. *United States v. Enmons,* 410 U.S. 396, 404–05 n. 14, 93 S.Ct. 1007, 1012 n. 14, 35 L.Ed.2d 379 (1973).

rent enrollment code could participate in the refund did not create any equitable rights in former enrollees. *Bolden*, at 1104–1105.

Former enrollees are particularly unable to claim any equitable interest in the refund because they are no longer policyholders in the Blue Cross plans in whose refunds they seek to share. In *Huber v. Martin*, 127 Wis. 412, 105 N.W. 1031 (1906), the Wisconsin Supreme Court held that upon dissolution of a mutual insurance company, its surplus reserves belong only to those who were its members at the time of dissolution, and not to former members. The court held that "the members of a corporation, and the members only, own the corporation and ... it is not permitted to any court upon its own notions of equity to take any part of the corporate property and distribute it to those not members.... Every policy-holder knows, or ought to know ... that in case of his interest so lapsing it will inure to the benefit of those associated with him who choose to retain their memberships and those who come after him...." *Huber*, 105 N.W. at 1039. While Blue Cross is not a mutual company, this principle is well recognized in the life insurance practice of paying annual dividends based on favorable risk experience (return of premium) only to those insured at the time the so-called dividend is declared. When plaintiffs elected to withdraw from Blue Cross or to change options within a plan, they ceased to be eligible policyholders of the respective plans and therefore are not entitled to any part of the plans' surplus reserves.

### E. *Plaintiffs' Equitable Claims*

 Plaintiffs do not argue that enrollees have a general equitable entitlement to the money held in their plan's reserve. Any such entitlement would contravene the statutory scheme. Section 8909(b) gives

OPM the discretion to use contingency reserves to lower rates, reduce contributions or increase benefits. To rule that enrollees have a general equitable interest in the reserves would divest OPM of its discretion. Additionally, it would go against agency practice of carrying over reserve balances from year to year to defray future rate increases, 41 C.F.R. § 16–4.152–1(b)(2).[5]

Plaintiffs claim entitlement only to the discrete sum of money already earmarked by defendants as surplus and refundable. They contend: "According to plaintiffs, by choosing to refund the money directly, rather than suspend withholding, for example, OPM created plaintiffs' equitable interest." *Bolden*, at 1104. As the district court correctly held, "[p]laintiffs' argument that OPM's discretionary choice of lowering FEHB [Plan] reserves automatically raises an equitable interest would create rights out of a void and has no merit." *Id.* at 1104. We agree.

OPM had the discretion to choose among several options under § 8909(b). For example, OPM could have reduced contributions in the amounts withheld from the paychecks of enrollees, or OPM could have negotiated lower rates for the following year. It would be "absurd to recognize any equitable interest solely on the basis of a discretionary, administrative decision—the fortuity that OPM chose a refund among the other available options." *Id.* We accordingly decide that plaintiffs have no equitable entitlement or interest in any part of the refund.

The decision of the district court is affirmed.

*Judgment accordingly.*

---

**5.** 41 C.F.R. § 16–4.152–1(b)(2) provides:

 (2) If upon redetermination there is a surplus of the subscription charges collected by the carrier over the cost of providing the benefits, the surplus is carried forward to the next contract term as a positive balance in an account called the "special reserve." Con-

versely, if the cost of providing the benefits exceeds the subscription charges collected, the deficit is carried forward to the next contract term as a negative special reserve balance. The special reserve balance becomes a factor in determining subscription charges for the next contract term.