CONSUMER FEDERATION OF
AMERICA and Public
Citizen, Plaintiffs,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
Defendant.

Civ. A. No. 93–97 (GK).

United States District Court,
District of Columbia.

Aug. 29, 1995.

Paul R.Q. Wolfson, Leslie A. Brueckner, Public Citizen Litigation Group, Washington, DC, for plaintiffs.

David Schanzer, Sheila Lieber, U.S. Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

KESSLER, District Judge.

### I. Introduction

Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq. challenging regulations issued by the Defendant, the Department of Health and Human Services, implementing the Clinical Laboratories Improvement Amendments of 1988, 42 U.S.C. § 263a.

Upon consideration of the parties' cross-motions for summary judgment, oppositions, replies, the applicable statutory and case law, and the case file in its entirety, the Court concludes that Defendant's Motion shall be denied and Plaintiffs' Motion shall be granted in part and denied in part.

### II. Statement of Facts

Plaintiff Consumer Federation of America ("CFA") is a nonprofit umbrella organization, representing approximately 200 other organizations (including rural electrical cooperatives, labor unions, senior citizen groups, credit unions, state and local consumer groups, etc.) who in turn have over 20,000,-000 individual members. CFA works to advance the interests of American consumers through advocacy, education, and research concerning the quality of health care. Plaintiff Public Citizen is a nonprofit organization, with over 160,000 members, that engages in advocacy, education, and research to improve the quality of health care in the United States. The Defendant Department of Health and Human Services ("HHS") is the executive agency given the responsibility for issuing regulations implementing CLIA and for assuring the quality of performance by clinical laboratories.

Plaintiffs allege that HHS has failed to carry out these statutory responsibilities for the following reasons. First, in establishing qualifications for laboratory personnel, HHS excluded consideration of "the risks and consequences of erroneous test results", as required by 42 U.S.C. § 263a(f)(1)(C). Plaintiffs allege that such exclusion also violated the notice and comment requirements of the Administrative Procedure Act, ("APA"), 5 U.S.C. § 553 et seq., because consideration of this factor had been included in the agency's original Notice of Proposed Rule Making. Second, with regard to the establishment of national quality assurance standards for cytology services [1], HHS failed to ensure that those who screen cytology slides would be tested, to the extent practicable, "under nor-

---

**1.** Cytology involves the microscopic examination of cells derived from the human body to detect malignancies and other abnormalities. The field includes the analysis and evaluation of "Pap smears" which are tests used to detect early signs of cervical cancer. *See* Declaration of Carlyn L. Collins, M.D., M.P.H., ¶ 2.

mal working conditions," as required by 42 U.S.C. § 263a(f)(4)(B)(iv). Third, HHS failed to compile and make available to the public the list of laboratories that have already been found to be in violation of state or federal law.

Because Plaintiffs believe that the Final Regulations fail to achieve the Congressional goal of protecting patients from the risk of laboratory errors, they seek a remand to the agency for a rewriting of the challenged provisions to accord with the statutory mandates. In addition, they seek a court order requiring promulgation and dissemination of the list of laboratories sanctioned under federal and state law.

### III. Statutory Framework

In 1988, Congress enacted the Clinical Laboratory Improvement Amendments, Pub.L. 100–578, 102 Stat. 2903, 42 U.S.C. § 263a ("CLIA '88").[2] After holding a series of hearings in both the House and Senate, Congress passed the 1988 Amendments to correct deficiencies in federal regulation of laboratories "that perform medical tests used in the diagnosis, prevention, monitoring and treatment of disease." H.R.Rep. No. 899, 100th Cong., 2d Sess. 10 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 3828, 3831.[3]

CLIA '88 established, for the first time, a comprehensive regulatory system under which hospitals, physicians' offices, and independent laboratory facilities that perform clinical tests are subject to federal oversight and supervision. CLIA requires all clinical laboratories performing tests and examinations on specimens from the human body to obtain certification from HHS. 42 U.S.C. § 263a(b).[4] In order to obtain such certification, laboratories must maintain quality assurance and quality control programs, meet personnel standards prescribed by HHS, submit to regular inspections which may be unannounced or announced, and participate in a proficiency testing program. 42 U.S.C. § 263a(f) and (g).

In particular, as to the issues raised in this lawsuit, CLIA '88 addresses the problem, examined at length in the House and Senate hearings,[5] of inadequately trained personnel. The statute directs the Secretary to issue standards which require laboratories

to use only personnel meeting such qualifications as the Secretary may establish ... which qualifications shall take into consideration competency, training, experience, job performance, and education and which qualifications shall, as appropriate, be different on the basis of the type of examinations and procedures being performed by the laboratory and the risks and conse-

2. Prior to enactment of the 1988 Amendments, only two groups of clinical laboratories were subject to federal law or regulation: those receiving reimbursement from Medicare were subject to Medicare regulations, and those receiving test samples shipped in interstate commerce were subject to the Clinical Laboratory Improvement Act of 1967, Pub.L. 90–174, 81 Stat. 533 ("CLIA '67"). All other laboratory testing, whether done in doctors' offices or in clinical laboratories, was exempt from federal law. See H.R.Rep. No. 899, 100th Cong., 2d Sess. 14–15 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 3828–3863 ("House Report"); S.Rep. No. 561, 100th Cong., 2d Sess. 3–4 (1988) ("Senate Report"). There was no conference report on CLIA '88. The final version was introduced and passed by the House on October 6, 1988 and by the Senate on October 11, 1988. See 134 Cong.Rec. 29,115–22, 29,834–39.

3. The House Report noted that its hearings had uncovered the following major problems:
    (1) a seriously flawed system for assuring compliance and an inadequate system of enforce-

ment of Federal standards; (2) a total absence of regulation for tens of thousands of laboratories, and diminished or duplicative regulation of many more; (3) an ineffective proficiency testing system for evaluating the performance of laboratories; (4) an inadequate system for overseeing screening for cervical cancer; and (5) a system fraught with inherent conflicts of interests, which in some instances compromise the quality of testing and ultimately, patient care.
H.R.Rep. No. 899, 100th Cong., 2d Sess., as reprinted at 1988 U.S.Code Cong. & Admin.News 3828, 3833.

4. The statute contains a waiver procedure for those laboratories which only perform simple examinations and procedures having "an insignificant risk of an erroneous result". 42 U.S.C. § 263a(d)(2) and (3).

5. See House Report, at 10, 13–15, 18–19 (findings); Senate Report, at 4, 21.

quences of erroneous results associated with such examinations and procedures. 42 U.S.C. § 263a(f)(1)(C).

\*     \*     \*     \*     \*     \*

In developing the standards ... the Secretary shall, ... take into consideration—

(A) the examinations and procedures performed and the methodologies employed,

(B) the degree of independent judgment involved,

(C) the amount of interpretation involved,

(E) the calibration and quality control requirements of the instruments used,

(F) the type of training required to operate the instruments used in the methodology, and

(G) such other factors as the Secretary considers relevant. 42 U.S.C. § 263a(f)(2).

As to the national quality assurance standards for cytology services, which had also been examined at length in the House and Senate hearings,[6] Section 263a(f)(4) directs that HHS include in those standards maximum workload limits for cytologists, requirements for record-keeping and monitoring in order to avoid the excessive workload which was causing high error rates, and

periodic confirmation and evaluation of the proficiency of individuals involved in screening or interpreting cytological preparations, including announced and unannounced on-site proficiency testing of such individuals, with such testing to take place, to the extent practicable, under normal working conditions. 42 U.S.C. § 263a(f)(4)(B)(iv).

Finally, 42 U.S.C. § 263a(n) directs HHS, starting April 1, 1990 and annually thereafter, to compile and disseminate to physicians and the general public a list of laboratories "which have been convicted under Federal or State laws relating to fraud and abuse, false billings, or kickbacks" as well as those who have been sanctioned under provisions of state and federal law.

**6.** *See* House Report, at 16–17; Senate Report, at 26–28.

## IV.  *Procedural History*

On May 21, 1990, HHS published a Notice of Proposed Rulemaking ("NPRM") setting forth proposed regulations for the implementation of CLIA '88. *See* 55 Fed.Reg. 20895 (May 21, 1990), (proposed 42 C.F.R. § 493.10). Comments and recommendations were to be submitted by August 20, 1990. Approximately 60,000 public comments were received. They were categorized and reviewed. The Public Health Service held several sessions with technical experts to further refine the proposed regulations. Very substantial changes were made when HHS issued its Final Rule, *see* 57 Fed.Reg. 7002, (February 28, 1992), in particular to those portions of the NPRM which related personnel qualifications to the kinds of tests being performed by laboratory technicians.

Most of the final regulations went into effect on September 1, 1992, although technical corrections were made on some of those regulations on January 19, 1993. *See* 58 Fed.Reg. 5211. HHS issued a further Notice about the Final Rule and response to comments on it on July 26, 1993. *See* 58 Fed. Reg. 39860.

## V.  *Legal Analysis*

### A.  Standing

"The Constitution limits the exercise of the federal judicial power to cases and controversies. An essential ingredient of this requirement is that the plaintiff have standing to challenge the action." *International Union, United Automobile, Aerospace, and Agricultural Implement Workers v. Donovan*, 577 F.Supp. 398, 401 (D.D.C. 1983). Defendant argues that the Complaint must be dismissed because neither Plaintiffs, nor their members, have suffered the type of personal, tangible, concrete injury necessary for standing.

Plaintiffs have described, in the body of their Complaint and the declarations they have submitted in opposition to the Defendant's Motion for Summary Judgment, in great detail the precise harm which they, as

organizational Plaintiffs will suffer, and which their members will suffer.

First, as to the Plaintiffs themselves, the injury to be suffered from regulations which do not comport with a statute designed to remedy inadequacies and errors in laboratory testing is not hard to identify. Plaintiff Public Citizen pays for 100% of its employees' health insurance. This insurance provides reimbursement for any clinical laboratory test performed for its employees, their dependents, and in some cases other family members. Public Citizen wants to make sure that it gets its money's worth out of the substantial payments it makes for its employees' health care. Its reimbursement payments are intended to purchase accurate, high quality medical tests. In addition, it wants to make sure that tests are performed accurately and efficiently, so that its health care premiums do not have to cover the costs of confirmatory and repetitious tests; so that false-positive test results do not lead to expensive and unnecessary medical treatment; so that false-negative test results do not lead to ignoring a serious medical condition which will, at a later point, require far more intrusive and expensive attention. Finally, Public Citizen has an interest in minimizing the absences of employees from work to deal with diagnosis and treatment of medical problems.

Second, the law is well established that organizations like Plaintiffs have standing to bring suit on behalf of their members as well as themselves if:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 [97 S.Ct. 2434, 2441, 53 L.Ed.2d 383] (1977).

The Defendant focuses its argument on the first prong of the *Hunt* test. As to the second prong, it is perfectly clear that both Plaintiffs are dedicated, as organizations, to improving the quality of health care of their members. As to the third prong, participation in this litigation by Plaintiffs' individual members is not required because only declarative and injunctive relief is sought, neither of which will rest on case histories of individual members.

Instead, Defendant argues that Plaintiffs' individual members (primarily organizations in CFA's case, and individuals in Public Citizen's case) have no standing to sue in their own right for two reasons: (1) they have alleged no "distinct and palpable injury" or any "realistic danger" that the regulations will cause such an injury in the future (*see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979)); and (2) they have failed to demonstrate a causal link between the injuries and the regulations under challenge (*see United Transp. Union v. ICC*, 891 F.2d 908, 912–913 (D.C.Cir.1989), *cert. den.* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990)).

Plaintiffs have shown that palpable and direct interests of their employees, members, and members' members will be affected by the regulations. Their declarations describe in concrete detail individuals who are, on a regular basis, taking various laboratory tests (such as pap smears, cholesterol tests, blood tests to detect hemochromatosis, and blood tests to detect Parvo virus) and whose medical and financial future will be affected by the outcome of those tests. Moreover, one of CFA's member organizations is Group Health Association, a health maintenance organization with offices in the Washington, D.C. area, which has a direct financial stake in the accuracy of such tests.

Based on these allegations and declarations, the Court concludes that Plaintiffs have clearly established not only a "distinct and palpable injury" to themselves, to their members, to their employees, and to their members' members but "a realistic danger of sustaining a direct injury in the future," *Babbitt, supra*, 442 U.S. at 298, 99 S.Ct. at 2308.[7]

---

7. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), relied on by the government, is not to the contrary. In that case, the Supreme Court ruled that members

In arguing that the "traceability" or causality prong of *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) has not been met, HHS seems to be saying that people must be misdiagnosed, or must die, or their medical conditions must worsen before they can challenge the validity of the CLIA '88 regulations. That is simply not what the case law requires. Moreover, the logical link between inaccurate laboratory test results and medical and economic injury to the patient being tested, as well as to health maintenance organizations such as Group Health Association, is too obvious to ignore. Given the premise of the legislation, that stricter regulation of clinical laboratory testing increases the protection of patients, "it is impossible to conclude ... that the causal relationship is 'purely speculative.' " *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977).

For all the foregoing reasons, the Court concludes that Plaintiffs have demonstrated sufficiently concrete, particularized, and tangible injury, traceable to the challenged regulations, to fully satisfy Article III standing requirements.

### B. APA Notice and Comment Requirements

■ Plaintiffs assert that the final regulations are invalid because HHS did not comply with the notice and comment requirements of the Administrative Procedure Act. Section 553(b)(3) of the Act requires that an agency proposing a new rule publish it in the *Federal Register* and include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

■ Plaintiffs recognize, as they must in light of the governing case law, that the rule which is finally adopted by an agency need not be identical to the one originally pro-

posed and published for comment. *Shell Oil Co. v. EPA,* 950 F.2d 741, 750 (D.C.Cir.1991); *American Federation of Labor v. Donovan,* 757 F.2d 330, 338 (D.C.Cir.1985). However, Plaintiffs maintain that because the final regulations deviated so substantially from those originally proposed, interested persons were deprived of an opportunity to comment.

■ In order to evaluate this argument, we must briefly compare the proposed and the final rule. *Donovan, supra,* 757 F.2d at 339. Initially, HHS proposed what it called a "complexity model" for classifying laboratory tests. 57 Fed.Reg. 7016. The agency recognized that "CLIA '88 provides that laboratory certification requirements must be based on test complexity and risk factors related to erroneous results", 55 Fed.Reg. 20,897, col. 2. Based on that recognition, it then divided all laboratory tests into three different categories of complexity, the most important of which was the possible consequence to the patient of an erroneous result.

Under the proposed rule, the first category of laboratory tests (Waived), which was subject to only minimal regulation of personnel qualifications, was based on four selection criteria, the first one of which was that there would be "[n]o reasonable risk to the patient if the test is performed incorrectly", 55 Fed. Reg. 20,901, col. 2. The Waived category included twenty eight simple tests. *Id.* The second category of laboratory tests (Level I), which required moderate regulation of personnel qualifications, was also based on four selection criteria, the most important one of which was that "there may be a reasonable risk of harm to the patient if the test is performed incorrectly", 55 Fed.Reg. 20,903, col. 1. The Level I category included eleven moderately complex tests. *Id.* The third category of laboratory tests (Level II), which required the strictest regulation of personnel qualifications, was based on five selection criteria, the first one of which was that

of Defenders of Wildlife could not prove direct injury by virtue of the increased rate of extinction of a particular species of wildlife in which they were interested because they could not even demonstrate that any of those members were likely to encounter or would try to encounter that species in the future. That is a far cry from the

facts of this case where patients are having and expect to continue having blood tests performed on a regular, periodic basis, are being monitored for medical conditions that could prove fatal if not detected through medical testing, and are required to have certain tests as a condition of their employment contract.

"[t]here is a reasonable risk of harm to the patient if the test is performed incorrectly and for some tests this risk is substantial", 55 Fed.Reg. 20,903, col. 2. The Level II category, involving the most strictly regulated tests, included all other tests and procedures. *Id.*

The Final Rule adopted by the Secretary retained the basic shape of the proposed rule. It divides all laboratory tests into the three classes originally proposed (Waived, subject to virtually no regulation; Tests of Moderate Complexity, requiring moderate regulation; and Tests of High Complexity, requiring the most stringent regulation. 57 Fed.Reg. 7001, 7004.) However, the Final Rule does not consider either the risks or the consequences of erroneous test results. Rather, each test (other than those in the Waived category) is given a score based on seven different criteria.[8] Depending on the score, laboratory tests are placed in the Moderate Complexity or High Complexity category. *Id.*

The issue before the Court is whether the changes in the Final Rule—primarily omission of "risk of harm" as a criteria for test classification—was a "logical outgrowth" of the original proposed rule. *Donovan, supra,* 757 F.2d at 338. The Court concludes that it was, and finds the Seventh Circuit case of *American Medical Association v. United States,* 887 F.2d 760 (7th Cir.1989) particularly persuasive both in terms of its factual similarity and its reasoning.

In that case, the AMA argued that the rules governing the allocation of income and expenses between a charitable organization's tax-exempt activities and its taxable business income were invalid because the public did not receive adequate notice of the Internal Revenue Service's intent to adopt a different allocation approach than that which it initially proposed. While the Court of Appeals agreed that the final IRS rule substantially changed the allocation methodology, it stated that

notice is adequate if it apprises interested parties of the issues to be addressed in the rule-making proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner. 887 F.2d at 768.

The NPRM in this case specifically stated, at a number of points, that the proposed laboratory test classification system was just that, a "proposal", that it was subject to the comments received from the public, and that the criteria and their application might well be changed. For example, in its preamble it stated:

> we are *proposing* categorizing non-waivered tests either as Level I or Level II based on test complexity; 55 Fed.Reg. 20,-897 (emphasis added).

and that:

> we *propose* to establish three levels of test by complexity. 55 Fed.Reg. 20,900 (emphasis added).

The NPRM later states that:

> We are interested in receiving recommendations for tests that should be added or deleted from the list of level I tests and the reasons for the recommendations. 55 Fed.Reg. 20,902.

The NPRM specifically noted that

> [the] proposed rule implementing the requirements for CLIA '88 provides an opportunity for comments from the public on the categorization of tests. We welcome commenters [sic] opinions on these suggested specialty and subspecialty revisions and any additional recommendations for alternative categories or divisions of existing specialties with documentation and information supporting the additions or revisions in test categories. 55 Fed.Reg. 20,-907.

The tone and tenor of the lengthy NPRM put the Plaintiffs, as well as all other inter-

---

**8.** The seven criteria are: (1) knowledge needed to perform the test, (2) training and experience required, (3) complexity of reagent and materials preparation, (4) characteristics of operational steps, (5) availability of calibration, quality control, and proficiency testing materials, (6) troubleshooting and equipment maintenance, and (7) degree of interpretation and judgment. Each laboratory test is given a score of 1 to 3 on each of the seven enumerated criteria. 57 Fed.Reg. 7001, 7004.

ested persons, on notice that HHS was prepared to reconsider its entire test classification scheme, including the factor of risks and consequences of erroneous test results. As the Seventh Circuit said in *AMA, supra:*

> The crucial issue, then is whether parties affected by a final rule were put on notice that "their interests [were] 'at stake'"; ... in other words, the relevant inquiry is whether or not potential commentators would have known that an issue in which they were interested was "on the table" and was to be addressed by a final rule. 887 F.2d at 768 (internal citations omitted).

The Final Rule did not deviate so significantly from the NPRM that interested persons did not know that an issue in which they were interested, i.e., test classification criteria, was "on the table" and that it would be subject to reformulation in whatever final rule the agency chose to adopt. For all the reasons discussed the Court concludes that Plaintiffs had ample notice of the full scope of the CLIA '88 proposed rule-making, and that the final laboratory test classification scheme adopted by the agency was a "logical outgrowth" of that which had been initially proposed.

### C. Failure to Consider "Risks and Consequences of Erroneous Results" in Establishing Personnel Standards

■ Section 263a(f) of CLIA '88 requires the Secretary of HHS to issue standards governing the certification of all facilities which perform clinical laboratory tests. The standards mandate that each certified laboratory must (A) "maintain a quality assurance and quality control program"; (B) "maintain records, equipment and facilities necessary for [its] proper and effective operation" (f)(1)(B); (C) "use only personnel meeting such qualifications as the Secretary may establish ..."; (D) "qualify under a proficiency testing program meeting the standards established by the Secretary"; and (E) "meet such other requirements as the Secretary determines necessary to assure consistent performance by such laboratories of accurate and reliable laboratory examinations and procedures".

Plaintiffs challenge the provision of the Final Rule requiring the Secretary to issue standards for personnel qualifications under Section 263a(f)(1)(C). They argue that the Secretary's Final Rule is either invalid as a matter of law because it fails to reflect any regard for the risks and consequences to patients from erroneous test results or, in the alternative, that its adoption was arbitrary and capricious.

Section 263a(f)(1)(C), in its entirety, reads as follows:

> Such standards shall require each laboratory issued a certificate under this section—
>
> (C) in performing and carrying out its laboratory examinations and other procedures, to use only personnel meeting such qualifications as the Secretary may establish for the direction, supervision, and performance of examinations and procedures within the laboratory, which qualifications shall take into consideration competency, training, experience, job performance, and education and which qualifications, *shall, as appropriate,* be different on the basis of the type of examinations and procedures being performed by the laboratory and the risks and consequences of erroneous results associated with such examinations and procedures ... (emphasis added)

The Secretary did not, in the Department's Final Rule, differentiate personnel qualifications for laboratory procedures on the basis of the risks and consequences of erroneous test results. She argues that the statute gave her the discretion to consider, and after consideration to disregard, the "risks and consequences" factor "as appropriate", and that such discretionary decision must be reviewed under an arbitrary and capricious standard.

■ The law is well settled as to the ordinary "shall"/"may" statutory distinction. "'Shall' is the language of command", *Moon v. United States Dep't of Labor,* 727 F.2d 1315, 1318–19 (D.C.Cir.1984), and "indicates the absence of discretion", *LO Shippers Action Committee v. Interstate Commerce Commission,* 857 F.2d 802, 806 (D.C.Cir. 1988). The "usual presumption [is] that

'may' confers discretion, while 'shall' imposes an obligation to act." *International Union, UAW v. Dole,* 919 F.2d 753, 756 (D.C.Cir. 1990) (citing *Haig v. Agee,* 453 U.S. 280, 294, 101 S.Ct. 2766, 2775, 69 L.Ed.2d 640 (1981)).

In this case, Congress used the word "shall" rather than "may" but muddied the waters by also using the term "as appropriate" which ordinarily denotes the giving of discretion to the decision-maker. When we parse Section (C), we see that the qualifications that the Secretary is to establish for personnel working in certified laboratories "shall" take into consideration competency, training, experience, job performance, and education. We also see that those qualifications "shall, as appropriate, be different on the basis of ... the risks and consequences of erroneous results ...".

Use of the term "shall", with its clear mandatory connotation, strongly suggests that Congress intended to require the agency to consider the risks and consequences of erroneous results. Congress chose to not use the word "may" which would have clearly denoted agency discretion and would have allowed the Secretary to ignore this factor, as she has done in the Final Rule [9]. Instead of using either "may" or "shall", Congress used the mutually contradictory words "shall, as appropriate". The most reasonable interpretation of that phrase, "shall, as appropriate", especially in the context of a remedial statute such as CLIA '88, is that Congress intended to require consideration of the risks and consequences of erroneous results, but that the agency retained the discretion to

assess that very broad and complex issue in the manner it deemed "appropriate".

This interpretation is consistent with the background against which CLIA '88 was passed and the legislative concerns that brought about its enactment. As discussed earlier, the original CLIA '67 was amended after both Houses of Congress held extensive hearings detailing many deficiencies and failures in clinical laboratory testing (see footnote 3, *supra* ). Congress clearly intended to provide a comprehensive regulatory system that would effectively deal with the problems it had just uncovered in its hearings. It would make no sense for it to enact a provision that would, in effect, fail to accomplish that purpose.

The interpretation advocated by HHS would make a nullity of the word "shall", as its Final Rule demonstrates. While there is no question that Section (f)(1)(C) could have been drafted more artfully, there is also no question that the Court should not adopt a statutory interpretation which would read certain words out of the statute and, in effect, ignore their existence.[10]

Moreover, the legislative history, while not as conclusive as Plaintiffs argue, does demonstrate that Congress did have before it an earlier Senate version of the bill which included the word "may". *See* S. 2447, 100th Cong., 2d Sess. (1988), reprinted in S.Rep. No. 561, 100th Cong., 2d Sess. 13 (1988). That bill was not enacted. Congress also had before it an earlier House version of the bill which included the word "shall". *See* H.R. 5150, 100th Cong., 2d Sess. (1988), reprinted in 134 Cong.Rec. 23603 (Sept. 13,

---

**9.** As the Court of Appeals noted in *International Union, United Auto., Aero. & Agric. Implement Workers v. Dole, supra,* 919 F.2d at 756, "Considering the frequency with which it uses the two words, Congress can be expected to distinguish between 'may' and 'shall'."

**10.** The government relies heavily on the case of *Marshall County Health Care Authority v. Shalala,* 988 F.2d 1221 (D.C.Cir.1993) which contained statutory language saying that "the Secretary shall provide ... for such exceptions ... as he deems appropriate", 42 U.S.C. § 1395ww(d)(5)(C)(iii)(1983). That case, which dealt with providing exceptions and adjustments to the statutory mechanism for determining the rate at which hospitals are to be reimbursed under the Medicare program, is less than helpful.

First, the court held that the agency's decision to refuse an exception was subject to judicial review, and rejected HHS' argument that the statutory phrase "shall, ... as ... appropriate" gave the Secretary such unlimited discretion that it was not subject to APA review. 988 F.2d at 1225. Second, the court clearly recognized the ordinary meaning of the statutory term "shall" when it noted that "the use of the mandatory 'shall,' in the statute ... might be thought to add at least some obligation to consider exemptions." 988 F.2d at 1225, fn. 2. Given the very different statutory framework in *Marshall,* and the limited nature of the court's holding, this Court does not find it to be compelling precedent for the analysis of the statutory provision at issue in this case.

1988). While that bill was not enacted either, the final statute, with its inclusion of the term "shall, as appropriate", and the deliberate use of the term "shall" rather than "may", is further evidence that the Secretary's interpretation of the statutory phrase would defeat Congress' purpose in using the word "shall".[11]

By interpreting the statute to require the Secretary, in setting the standards for personnel qualifications, to consider the risks and consequences of erroneous results of different examinations and procedures, but to give the Secretary discretion in determining how to appropriately weigh such risks and consequences of harm, we honor the wording of the statute, we avoid a construction that would eliminate the meaning of one word used in the statute, and we adopt a construction that is consistent with a remedial statute designed to improve the health of the American public.

### D. Proficiency Testing for Cytologists under Normal Working Conditions

■ CLIA '88 provides that "the Secretary shall establish standards for the proficiency testing programs for laboratories" which receive certification. 42 U.S.C. § 263a(f)(1)(C) and § 263a(f)(3)(A). Because of the vivid testimony presented to Congressional Committees about the error rate, due in large part to overwork, in evaluating pap smears, Congress required that the Secretary

establish national standards for quality assurance in cytology services designed to assure consistent performance by laboratories of valid and reliable cytological services. 42 U.S.C. § 263a(f)(4)(A).

Congress specified that such standards shall include

(i) the maximum number of cytology slides that any individual may screen in a 24–hour period, [and]

(iv) periodic confirmation and evaluation of the proficiency of individuals involved in screening or interpreting cytological preparations, including announced and unan-

nounced on-site proficiency testing of such individuals, with such testing to take place, to the extent practicable, under normal working conditions, ... 42 U.S.C. § 263a(f)(4)(B).

Plaintiffs challenge the Final Rule on the ground that its specific provisions for on-site proficiency testing do not incorporate the statutory requirement that cytologists be tested under "normal working conditions".

In its Final Rule, HHS established a workload limit of no more than 100 slides in an 8 hour workday. Thus, the maximum workload rate is 12.5 slides per hour. 57 Fed. Reg. at 7072, 7169. Despite that maximum workload rate, the Final Rule provides that proficiency testing shall take place at the rate of 5 slides per hour, for a two hour test, less than one-half the rate at which laboratories could require their employees to examine slides. 57 Fed.Reg. at 7041, 7150. Moreover, if individuals fail the first test (i.e., misidentify more than 10% of the slides reviewed), they are then allowed an additional 4 hours to complete a follow-up test examining 20 slides. *Id.*

Significantly, the Final Rule permits preannounced, rather than unannounced, testing thus enabling slide examiners to know when they are being tested, whereas the proposed rule provided for at least one unannounced, on-site test at every laboratory. 57 Fed.Reg. at 7041, col. 2.

The Final Rule itself contains virtually no discussion or explanation of how this procedure, with testing being held at a far slower rate than the maximum permissible work rate, reflects "normal working conditions". The only justification offered by HHS is that "we have added a maximum time allowed for each testing event, based on the [proficiency testing] program in the State of Maryland", and that the slower pace would "allow individuals sufficient time to complete the test at their *normal pace* without unduly restricting or extending the time for the examination." 57 Fed.Reg. 7041, col. 3. (emphasis added). "Normal pace" is not the equivalent of "nor-

---

**11.** *See Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074, 1090 (D.C.Cir.1987) (en banc).

mal working conditions". There is no definition of either "normal pace" or the statutory term "normal working conditions." However, what is clear, as Plaintiffs argue, is that any Pap test screener who is working at the maximum rate of 12.5 slides per hour that HHS has approved will not be tested under their normal working conditions since that screener will only be tested at 5 slides per hour.

The agency's terse justification does not constitutes a "reasoned analysis", *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. den.,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971), of the agency's choices for implementation of the statutory language. The agency must " 'articulate a satisfactory explanation' for its action including a 'rational connection between the facts found and choice made[,]' " *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 814 (D.C.Cir.1983) (internal citations omitted), *cert. den.,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). The text of the Final Rule fails to do that.

The agency has attempted to provide such a "satisfactory explanation" to supplement what it concedes is "the cursory explanation,[12] for the regulation contained in the preamble to the Final Rule", in the *post hoc* declaration submitted by Carlyn Collins, M.D., M.P.H. She offers the following justification for the agency's Final Regulation, claiming that it contains the reasoning that HHS relied upon at the time.[13]

First, she explains that HHS adopted the same time limits used in a proficiency testing program that had been operation in Maryland since 1990. Dr. Collins acknowledges that those time limits "were established to provide for equitable testing on a national scale and to allow individuals sufficient time to complete the test *at their normal pace* without unduly restricting or extending the

time for the examination." ¶ 4. (emphasis added). As noted earlier, "normal pace" is not the equivalent of the statutory requirement of "normal working conditions".

Second, she then states that the agency concluded that the Maryland requirement of a 5 slide-per-hour review satisfied the CLIA '88 statutory requirement that testing take place "under normal working conditions ... even though a cytotechnologist that reviews the maximum number of slides allowed per day will screen approximately 12.5 slides per hour." ¶ 5. The conclusion simply does not follow from the factual premise. If a technician is allowed to screen 12.5 slides per hour, how can the agency conclude that testing at a rate of only 5 slides per hour constitutes testing "under normal working conditions"?

In an attempt to explain this apparent inconsistency, Dr. Collins states that technicians are required to review a much higher percentage of abnormal slides during proficiency testing (at least 30%), than they review during a normal work day (5%) and that it takes more time to review abnormal slides than normal ones. She also points out that it is essential to test a larger percentage than normal of abnormal slides in order to gauge a technician's knowledge of the full range of abnormalities that might arise in daily practice. For these reasons, she concludes that it is simply not "practicable to precisely duplicate a typical working day when designing a supervised, time-limited proficiency program." ¶ 5b.

Without offering any detailed reasoning, or studies, or citations to the medical literature, and without explaining the experience of the Maryland program on which she heavily relies, Dr. Collins reaches a conclusion that flies in the face of the statutory mandate which directs the agency to conduct its profi-

---

**12.** Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and Reply Memorandum in Support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, p. 30.

**13.** The Court is aware that Plaintiff's Motion to Strike Dr. Collins' Declaration was granted at a much earlier point. Upon reconsideration, the

Court has decided to allow its inclusion in the record since it does purport to represent the reasoning on which HHS relied in developing the final regulations. Since both parties discussed it extensively in their memoranda of law, no one will be prejudiced by the Court's consideration of it at this time.

ciency testing "under normal working conditions".[14]

Defendant argues that "the question before the Court is whether HHS' regulation is based on a 'permissible construction' of CLIA that is 'rational and consistent' with the statute. *Sullivan v. Everhart*, 494 U.S. 83, 89, 110 S.Ct. 960, 964–65, 108 L.Ed.2d 72 (1990) (internal quotations omitted)."[15] On this record, Defendant has failed to establish that its construction of CLIA is rational and consistent with the statute. On the contrary, its construction is patently inconsistent with the statutory mandate which requires testing under normal working conditions, and it has failed to offer a rational or satisfactory explanation as to why it cannot develop proficiency testing for cytologists which will reflect such normal working conditions.[16] Consequently, the proficiency testing regulations for cytologists can not stand.

### E. Compilation and Publication of List of Sanctioned Laboratories

■ HHS has represented that it will in the very near future issue and distribute a laboratory registry that lists laboratories covered by CLIA '88 that have been sanctioned from January 1989 to December 1992. That commitment has probably been fulfilled by this time. In any event, those actions, once taken, would fully satisfy CLIA's directive that HHS make such a registry available "to physicians and the general public," 42 U.S.C. § 263a(n), and the Plaintiffs do not disagree. Consequently, Plaintiffs' claims on this issue have now become moot.

An Order consistent with the foregoing Memorandum Opinion will be issued this day.

### ORDER

Upon consideration of both parties' Motions for Summary Judgment, the briefs and arguments of counsel, and the entire record, it is hereby ORDERED and DECLARED that:

1. Plaintiffs' motion for summary judgment is **granted in part** and **denied in part.**

2. Defendant's motion to dismiss, or, in the alternative, for summary judgment is **denied in part** and **granted in part.**

3. (a) Defendant's criteria for the categorization of laboratory tests and its categories and schedules of laboratory tests based on these criteria, 42 C.F.R. § 493.17, 57 Fed. Reg. 7141, 57 Fed.Reg. 7018–19, 7245–88, 58 Fed.Reg. 39,879–39,973, are arbitrary and capricious, and contrary to law, because Defendant failed to consider the risks and consequences of erroneous results associated with such tests, as required by the Clinical Laboratory Improvement Amendments of 1988 ("CLIA '88"), 42 U.S.C. § 263a(f)(1)(C);

(b) Defendant shall, within **90 days** of this order, place a notice in the *Federal Register* proposing regulations pursuant to 42 U.S.C. § 263a(f)(1)(C) that classify laboratory tests and establish personnel standards for laboratory tests taking into account the risks and consequences of erroneous test results, and requesting public comment on the same; and Defendant shall issue a final rule regarding the same within a reasonable time thereafter; and

(c) The test classifications and personnel standards promulgated by HHS on February 28, 1992, shall remain in effect pending the

14. Moreover, it is clear that the agency did not even attempt to comply with the statutory mandate. "[W]e did not assume that 'under normal working conditions' cytotechnologists will examine 100 slides each day." Collins Declaration, ¶ 5a. But that is precisely the limit that HHS itself set as the maximum permissible workload, and, therefore, presumably constitutes "normal working conditions" since any lab technician can legally be required to meet that standard.

15. Memorandum of Law in Support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, p. 30.

16. The Court of Appeals recently re-affirmed the need for reasoned decisionmaking with a full agency explanation. *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (1995): "To enable us to fulfill our duty, 'an agency must cogently explain why it has exercised its discretion in a given manner,' *Motor Vehicle Mfr's Assn. of the United States, Inc. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983); and that explanation must be sufficient to enable us to conclude that the [agency's action] was the product of 'reasoned decisionmaking.' *Id.* at 52, 103 S.Ct. at 2871.".

issuance of the new classifications and standards ordered *supra.*

4. (a) Defendant's regulation governing proficiency testing of cytologists, 42 C.F.R. § 493.855, is arbitrary and capricious, and contrary to law, because it fails to require that cytologists be tested, "to the extent practicable, under normal working conditions," as required by CLIA '88, 42 U.S.C. § 263a(f)(4)(B)(iv);

(b) Defendant shall, within **90 days** of this order, publish a notice in the *Federal Register,* proposing regulations pursuant to 42 U.S.C. § 263a(f)(4)(B)(iv) regarding proficiency testing of cytologists to ensure that cytologists are tested, to the extent practicable, under normal working conditions, and requesting public comment on the same; and Defendant shall issue a final rule regarding the same within a reasonable time thereafter; and

(c) The proficiency testing regulations for cytologists promulgated by HHS on February 28, 1992, shall remain in effect pending the issuance of the final proficiency testing regulations order *supra.*

5. (a) Defendant has satisfied its statutory obligation to compile a registry of sanctioned laboratories and make that registry available to physicians and the general public, as required by 42 U.S.C. § 263a(n).